| PLAQUEMINES DIRT & CLAY COMPANY, L.L.C. | * | NO. 2024-CA-0838 |
|---|---|---|
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| PLAQUEMINES PARISH GOVERNMENT | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 66-276, DIVISION "B"
Honorable Michael D. Clement
\* \* \* \* \* \*
**Judge Daniel L. Dysart**
\* \* \* \* \* \*

(Court composed of Judge Daniel L. Dysart, Judge Rosemary Ledet, Judge Paula A. Brown)

Stephen O. Scandurro
Timothy D. Scandurro
Jean-Paul Layrisson
SCANDURRO & LAYRISSON, L.L.C.
607 St. Charles Avenue
New Orleans, LA 70130

COUNSEL FOR PLAINTIFF/APPELLEE

L.V. Cooley, IV
William S. Culver
Rennie Buras
Jacque Touzet
Plaquemines Parish Government
333 F. Edward Hebert Blvd
Building 100
Belle Chasse, LA 70037
333 F. Edward Hebert Blvd., Bldg. 100
Belle Chasse, LA 70037

Jimmy A. Castex, Jr.
W. Lee Kohler
CASTEX ESNARD, L.L.C.
650 Poydras Street
Suite 2415
New Orleans, LA 70130

COUNSEL FOR DEFENDANT/APPELLANT

**AMENDED, AND AS AMENDED, AFFIRMED**

**SEPTEMBER 22, 2025**

*DLD*
*RML*
*PAB*

Plaquemines Parish Government ("PPG") appeals the October 25, 2024 trial court judgment in favor of Plaquemines Dirt and Clay Company, LLC ("PDC"), and against PPG awarding PDC $14,958,600.00 as the fair market value of their property appropriated for the levee project known as "NOV-NF-W-06A.2, First Levee Lift and Drainage Canal Relocation Project Pointe Celeste to West Pointe-a-la-Hache." This judgment includes compensation for the diminished value of the remaining portion of PDC's property, plus legal interest on the amount accruing from the appropriation on September 14, 2017, until paid in full. The judgment also awarded PDC all court costs and expert fees in the amount of $36,919.36 and attorneys' fees in the amount of $2,500,000.00 pursuant to La. R.S. 38:301(C)(2)(f) against PPG, plus legal interest on these amounts accruing from the date of the judgment until paid in full.[1]

**FACTS AND PROCEDURAL HISTORY**

---

[1] The final judgment appealed from amended the original judgment, which did not specifically state that interest ran from the date of appropriation, September 14, 2017.

1

This case involves a dispute regarding the amount of compensation owed to a landowner (PDC) by PPG for land appropriated for a federal levee project in Plaquemines Parish. Following Hurricane Katrina in 2005, the United States Army Corps of Engineers ("USACE") embarked upon a master project to construct a hurricane protection levee system from New Orleans to Venice, Louisiana in lower Plaquemines Parish on the West Bank of the Mississippi River. On January 16, 2008, PDC acquired a tract of land known as Farm Fields 59 and 64 for $1,305,996.00 from Pointe Celeste River Properties, LLC, a company owned by William Nungesser. This tract of land, which contained approximately 575 acres, was used as a borrow pit operation by PDC. The property is divided into a north pit and south pit and prior to the construction of the new levee system, was protected only by a much smaller levee at the rear portion of the property. In 2010, before federal funding for the new levee system was approved, USACE approved PDC's property as a "contractor-furnished" borrow pit, which meant that PDC would be included on a list of contractors bidding for jobs whose pits were pre-approved for mining borrow material.

On April 18, 2012, Citrus Lands Services, LLC ("Citrus Lands") - the company from whom Mr. Nungesser had purchased the property in 2006 with Citrus Lands retaining certain servitude rights - transferred to PPG certain lands comprising a non-federal back levee system, including the back levee along PDC's property. This transfer was made in exchange for PPG's commitment to maintain and improve the levees and pumping stations located on the property.

2

On June 22, 2012, PPG entered into a Project Partnership Agreement with USACE and the Coastal Protection and Restoration Authority Board of Louisiana ("CPRA") regarding the federal levee project, with PPG and CPRA acting as the non-federal local sponsors. This agreement covered the federalization of PPG's pre-existing back levee system and its incorporation into the New Orleans to Venice, Louisiana Hurricane Protection Project. Under the agreement, PPG was required to acquire the necessary land rights needed for the project. PPG was tasked with appropriating easements and properties for the new levee system because USACE does not have appropriation or expropriation powers.

Pursuant to Plaquemines Parish Ordinance No. 17-121, PPG appropriated, effective September 14, 2017, "New Perpetual Levee/Floodwall Easements" and "New Perpetual Flood Protection Levee Floodwall & Drainage Ditch Easements" covering 67.8059 acres of land owned by PDC, and a "New Temporary Work Easement" covering 0.5443 acres of land owned by PDC.

The ordinance that authorized the appropriation of a portion of PDC's property reserved all rights to the landowners "as may be used without interfering with or abridging the rights and easements hereby acquired." The appropriated land bisects PDC's property. The new levee alignment protects a portion of PDC's property, but leaves approximately 300 acres between the new levee and the existing levee, thereby leaving this latter portion unprotected by the new levee. In its taking of 68.3502 acres of PDC's property for the new levee, PPG relied on the

3

appraisal of real estate appraiser Henry Tatje, and tendered a check in the amount of $274,000.00 to PDC as compensation for the appropriated land. PDC accepted the check, while specifically reserving all rights to seek additional compensation. PDC filed suit against PPG on September 11, 2020, seeking recovery for an increased amount of compensation. Beginning on March 18, 2024, a three-day bench trial took place.

**TRIAL TESTIMONY**

The first witness at trial, who testified by video deposition, was Louisiana Lieutenant Governor William "Billy" Nungesser. Mr. Nungesser testified that he was elected Plaquemines Parish President in 2006, the year after Hurricane Katrina. Prior to Hurricane Katrina, Mr. Nungesser signed an option to purchase the property currently owned by PDC from Citrus Lands. He stated that the property was an existing borrow pit prior to Katrina. Mr. Nungesser testified that if the levees were ever raised or needed dirt, there would be some value in the dirt in that pit because it was already an approved borrow pit. His primary motivation in buying the property was for borrow pit purposes.

Mr. Nungesser later exercised the option to purchase the property in the name of a company he owned called Pointe Celeste River Properties, LLC. The sale of Farm Fields 59 and 64 from Citrus Lands to Pointe Celeste was completed on December 29, 2006 for the purchase price of $1,305,996.00. At the time of the sale, Mr. Nungesser had been elected Plaquemines Parish President but had not yet

4

taken office. The property at issue had only a four-foot levee in the back of the property, and the new federal levees had not yet been approved by Congress.

Mr. Nungesser testified that, after Congress appropriated funds for the federal levees, he received a verbal offer of $6,000,000.00 for the borrow pit property from "an Alabama company or gentleman."[2] He was advised by his attorney that accepting this offer, while legal, could present a problem for him because of the perception that he used his political office to enrich himself by actively pursuing federal funding to build levees on properties including the borrow pit property that he acquired from Citrus Lands. He testified that although his motivation for pursuing funding for the federal levees was strictly to protect the parish, he chose to sell the property to some friends for the exact same price that he paid for it in order to avoid the perception that his motivation was to enrich himself. He had not been actively marketing the property at that time, and he told the friends about the higher offer from the company or gentleman from Alabama. The friends who bought the property formed the entity of PDC for the sale, and the sale was completed on January 16, 2008.

When Mr. Nungesser bought the land from Citrus Lands and when he sold it to PDC, he was under the impression that the borrow pits were "grandfathered" and therefore not subject to subsequently enacted parish regulations regarding borrow pits in the parish.

_____

[2] Mr. Nungesser's testimony does not include the identity of the Alabama company or gentleman who made the verbal offer to buy the property.

When asked if he had any further involvement with the operation of the borrow pit or PDC after the sale, Mr. Nungesser said that because some members of the Parish Council objected to PDC being able to dig on the property, he requested and approved a letter sent from the Parish Attorney to USACE, stating the Parish Attorney's position that PDC was not subject to the Council's new borrow pit ordinances that were passed in 2009. Included in those ordinances was the requirement that borrow pit holes be backfilled with river sediment.

In 2011, before Congress appropriated the funding for the federal levees, the Parish Council authorized PPG to acquire easements and properties in connection with the new levee project. Citrus Lands had already donated to PPG rights-of-way for existing levees, canals and pumping stations that it owned. Prior to the Act of Transfer from Citrus Lands to PPG for this donation, Citrus Lands had been responsible for the drainage in this area. Following the transfer, PPG assumed responsibility for the operation and maintenance of the levees, canals and pumping stations.

The next witness was Hugh McCurdy, III, a professional land surveyor. He did the survey for the sale of the property at issue from Pointe Celeste, Mr. Nungesser's company, to PDC. Mr. McCurdy testified that the new levee has been placed mostly where the old levee used to be. But the new levee makes a deviation through the center of PDC's property. After Mr. Nungesser sold the property at issue to PDC, Mr. McCurdy surveyed the property for locations of new borrow pits. He also staked out a buffer zone for wetlands areas that PDC could not

disturb. He determined that there were 118.1 acres of existing borrow pits at the time of his survey. He calculated that there were 3,470,000 cubic yards of volume remaining inside the borrow pits. He stated that the borrow pits were there before PDC bought the property.

Mr. McCurdy testified that PPG hired him to do a survey of the areas between the drainage canal and the levee in order for engineers to be able to reconfigure the drainage so that it flows toward the Mississippi River from the preexisting back levee. Mr. McCurdy said drainage on the south pit would be an issue after construction of the new levee because it would be dependent on a sluice gate built through the new levee and on PPG's maintenance of the back existing levee. He said that the property in the south pit is outside of the protection of the new levee system, and will be "a bowl" if the drainage is not maintained correctly. His calculations of acreage and volume of material did not include the south pit.

On cross-examination, Mr. McCurdy acknowledged that, as a surveyor, pricing of properties and per acre pricing is typically not something he does. He also stated that his work for PPG did not include giving an opinion as to what might need to be done to provide drainage to the property. He said his work product would be submitted to an engineer to design a drainage plan. Mr. McCurdy admitted that he is not qualified to do a drainage study of the PDC property.

His survey calculated acreage and total volume of material remaining the borrow pits in cubic yards. But he acknowledged that he was not qualified to say

7

whether that volume would all be usable material or whether some of it would be spoil material that could not be sold.

The next witness was Michael Gaffney. Mr. Gaffney, an attorney, testified that he was contacted by Mr. Nungesser in 2007 after Mr. Nungesser had been become Parish President. Mr. Nungesser hired Mr. Gaffney regarding potential post-Katrina reconstruction projects in Plaquemines Parish after learning that the FEMA (Federal Emergency Management Agency) did not fund project management. Mr. Nungesser told Mr. Gaffney that he had a particular piece of property that he wanted to sell but he did not want the appearance of profiting from reconstruction projects because of his political position.

In order to avoid that appearance, he said he wanted to sell the property for the same price he had paid for it. To that end, Mr. Gaffney arranged for a group to buy the property in 2008 from Mr. Nungesser for the approximately $1.3 million that he paid for it in 2006. The group established a business entity for the purchase and named the business PDC.

Mr. Gaffney testified that the property purchased by the group was an existing dirt pit, and the newly formed business wanted to develop it because of the belief that new levees would eventually be built in that area and the dirt could be sold for that purpose and for other construction projects. Mr. Gaffney stated that the PDC property had certain operational advantages because it was a preexisting borrow pit that had been approved by USACE so there was an indication that the materials still at the site would subsequently be approved by USACE.

8

Because the property acquired by PDC was a back parcel and not on a highway, Mr. Gaffney sought to ensure that the property had adequate access. A title search revealed that there were two access routes to get to the property, one at the edge and one toward the middle. The property had a predial servitude of passage, so Mr. Gaffney said this assured PDC it could access its property.

At the time of the sale of the property to PDC, Congress had not yet appropriated funding for the new levees. That occurred several years later. After the sale but before Congress funded the levee project, PDC hired an engineering consultant to determine if the property had material that would be acceptable to USACE and if so, the estimated quantity of that material. PDC had been selling material after the 2008 purchase for private works but not yet to USACE. After receiving a favorable report from the consultant, PDC submitted a proposal to USACE detailing how it was going to develop the borrow pit.

In 2009, the Parish Council passed new regulations regarding the operation of borrow pits. Among other changes, the new regulations imposed a requirement of backfilling pits after they were emptied, and PDC's position was that it was exempt from the new regulations because the PDC borrow pits were already in existence prior to the enactment of the new regulations. The Parish Council initially objected to PDC being exempt from the new regulations, but in June 2011, PPG granted PDC the right to operate as a legal nonconforming use, which meant PDC was not subject to new regulations on its borrow pits. A Permit Variance Agreement between PDC and PPG acknowledged that PDC did not have to

9

comply with the 2009 ordinances, but PDC pays PPG $10,000 each year for this Agreement. PDC contacted USACE, and informed it that PDC was approved and ready to provide materials for any of USACE's projects.

Under the above-referenced 2012 Project Partnership Agreement, PPG was tasked with appropriating easements and properties for the levees because USACE does not have appropriation or expropriation powers. Mr. Gaffney explained that the local government has those powers, so the local government acquires property on behalf of the federal government for its construction projects and the federal government then pays the local government for the property. In addition to other acquisitions, PPG acquired the levee, canals and pumping stations over which Citrus Lands still retained servitudes. As part of that transfer, PPG assumed responsibilities for the operation and maintenance of those levees, canals and pumping stations.

USACE's design of the new levee placed it through the middle of PDC's property. Mr. Gaffney stated that the new levee would place a significant portion of PDC's property on the unprotected side of the levee, and would present access and drainage problems that would impact PDC's ability to conduct its borrow pit operations. Mr. Gaffney said PDC sent a letter to USACE complaining about the proposed location of the new levee. He stated USACE responded that it would construct sluice gates on PDC's property, which could be opened after a flooding event and the water could be pumped out. He acknowledged that PDC has access roads in place to cross the new levee, but his concern is that PDC does not have a

10

servitude to do so. Thus, PDC's ability to access its property will still be within USACE's control, and that access could be denied by USACE at its discretion. According to Mr. Gaffney, because PDC does not have a *right of access* and will not have operational control of the sluice gates, this could affect a potential customer's decision to buy materials from PDC.

Philip Ramon, III, a member and managing partner of PDC, was the next witness. He has been involved with PDC since its inception. He testified regarding the consulting firm hired by PDC in early 2008 to perform geotechnical testing at the site. The outcome of that testing was that PDC had usable clay that would meet USACE's requirements and PDC should be able to be preapproved for use in its projects. As stated above, PDC later received that preapproval from USACE. Mr. Ramon testified that PDC was selling its product before being preapproved by USACE. The preapproval by USACE was a marketing tool used to PDC to attract potential customers. The business model of PDC was to allow contractors to bring in their own heavy machinery and dig and process their own dirt or clay. This model was also attractive to contractors because they did not also have to pay PDC for the digging process.

Mr. Ramon stated that from 2008, when PDC began its operations, to 2017, when PPG appropriated the PDC property for the levee project, 59.02% of PDC's sales were for nonfederal projects. He also stated that 42.46% of all PDC's project sales over the lifetime of PDC's operations have been for nonfederal projects. USACE did not buy any material from PDC for the construction of the new levee.

Mr. Ramon testified that after plans for the new levees were released, PDC had difficulty selling its product because PDC could not guarantee to contractors that they would be able to access the PDC property. He said the two access ramps over the new levee that were built by USACE – one to access the north pit and the other to access the south pit - will be quickly degraded by the type of heavy loaded dump trucks that will need to cross the levee. The access ramps are on a slope and are covered with seven inches of crushed gravel.

Mr. Ramon stated that PDC has had no new contracts since construction began on the levee. He claimed that contractors' vehicles exceeding a certain weight will need a special permit from USACE to cross the levee. In support of his more general contention that access to PDC's property will be affected, he cited a section of USACE's Levee Permit Policy, which states, in part: "Work on or near hurricane risk reduction levee will be restricted during hurricane season and will be evaluated on a case-by-case basis for possible waiver." Mr. Ramon referred to an additional dirt access road 2 ½ miles north of the PDC property, but said that truck drivers complained that the dirt road caused damage to their vehicles. He also said that there are drainage concerns for PDC's property, especially the south pit that will be outside of the protection of the new levee and more prone to flooding. He stated his belief that the new levee will put PDC at a severe financial disadvantage.

On cross-examination, Mr. Ramon acknowledged that a letter from USACE was sent to PDC explaining that USACE would construct ramps to provide access to PDC on both sides of the new levee. He was also told that PDC would have to

12

be inconvenienced while construction was ongoing. USACE also told PDC by letter that it would provide a drainage structure for PDC's property. He contends that drainage issues on both the north and south pits are different than they were before construction of the levee. He said the north side now drains toward the pre-existing back levee. He said during Hurricane Ida in 2021, all of the south pit remained flooded for an extended period of time.

Stephen Cali, a professional civil engineer, was the next witness. He was accepted by the trial court as an expert in the field of civil engineering, including the permitting of land for development, including borrow pits and operations thereof. In 2008, he was hired by PDC to prepare documents that would qualify PDC as a government-approved contractor-furnished borrow pit. He explained that following Hurricane Katrina, USACE started a borrow program and advertised for landowners to submit their land for qualification as a borrow pit. If the land was accepted as such by USACE, the landowner would appear on a list of contractors bidding for a job whose pits were preapproved for mining borrow material.

Mr. Cali engaged a firm called PSI to do the geotechnical testing on PDC's property. PSI found that PDC's property contained at least 13 million cubic yards of suitable clay. In January 2010, USACE approved PDC as a contractor-furnished borrow pit. With the new levee traversing the PDC property, the north pit is now on the protected side of the levee and the south side is now

what PDC refers to as "orphaned.[3]" PDC considers the south side orphaned because it is unprotected by the new levee and so is more subject to flooding. He stated that the orphaned area is 301.32 acres, and could be mined if accessible. He testified as to potential drainage issues on both the north and south pits.

Mr. Cali calculated that 71.68 acres of PDC's property were taken by the new federal levee. Included in that calculation is approximately 68 acres for the levee and an additional amount for easements that surround the levee system including setbacks off the levees.[4]

He described the access ramps built by USACE as long ramps from both sides of the levee with a crushed stone base on top of a filter cloth fabric, which is on top of a clay bed. His opinion is that the way USACE regulations are written, PDC will need permission from USACE to cross the new levees after construction is completed. He also opined that the ramps will be degraded very quickly by loaded dump trucks crossing, and that this will have an impact on PDC's borrow pit operations because maintenance issues will have to be addressed. Once the levee construction project is completed, USACE will turn over operations and maintenance of the levees to PPG.

Mr. Cali also testified as to the drainage structure being built by USACE. He said that, when closed, the sluice gates will cut off the flow of water during a hurricane or storm, and the culverts can be sealed off so there are no tidal surges of

_____

[3] In this opinion, we will also use the term "orphaned" to describe the south pit but only because it is not protected by the new levee system but remains protected only by the preexisting back levee.
[4] The parties stipulated at the end of PDC's case that the servitude taken on PDC's property for the levee is 68.3502 acres.

water flowing back from the unprotected side of the property to the protected side. But the effect of the closure of the sluice gates during a storm event is that there will be a ponding of water. To remove the water, the sluice gate will have to be reopened and the nearby pump station activated to drain the water through the pumping system.

Mr. Cali's opinion is that access and drainage issues will be serious impediments to contractors trying to access the orphaned area. He stated that because that the placement of the levee basically divides the borrow pit in two, his opinion is that this has eliminated PDC's ability to operate its south pit. He said the vital operation of the south pit will be affected because contractors digging in the south pit need access to the north pit to move the materials to the north pit to "lay down" and process the materials. He said if contractors need to travel a greater distance to process their materials, PDC will be less attractive to potential customers.

When asked on cross-examination to explain the basis for his opinion that drainage will be worse after the levee is constructed than before, he stated that if trash and grass block the opening of the trash racks on the sluice gate, drainage will be blocked. He also stated his opinion that the culverts in the sluice gates are inadequately sized to handle drainage.

The next witness was Baldwin Justice, an expert in the field of real estate valuation and appraisal. He testified that he was engaged by PDC to determine an opinion of market value for the PDC property both before and after the

15

appropriation of the property in order to determine just compensation for PDC. He stated that this was a large acreage tract of land that was a permitted borrow pit operation with a history of significant revenues generated by the sale of borrow pit materials. He disputed PPG's description of this property at pastureland, and said instead that it was an investment use property.

Mr. Justice testified that this market area has been experiencing a significant infusion of capital from major industrial development, which should result in positive growth trends in property values. His opinion is that the highest and best use of the PDC property is for continuing use as a borrow pit operation. He explained that highest and best use, at the time of the taking, is a critical component of the appraisal process. He stated that the four tests for determining highest and best use are: 1) what is legally permissible to be done on the site; 2) what is physically possible; 3) what is financially feasible; and 4) what use is going to generate the greatest return to the land.

He performed a land residual analysis, which he described as a projected income and discounted cash flow analysis to arrive at the land's value at the time of the taking. Because his search revealed no market sales of property with permitted and active clay borrow pits in Plaquemines Parish, Mr. Justice considered land in other parishes as comparable properties, although the other properties were industrial sites or sites acquired for industrial development rather than borrow pit properties.

The mean average value of the comparable properties was $196,477.00 per acre. He valued the 118 acres of the PDC property where active mining cells were at the time of his appraisal at $140,000.00 per acre. He arrived at this significantly lower value per acre because of the fact that the PDC property is not on Louisiana Highway 23, but rather has to be accessed by gravel roads. Additionally, there was less industrial development in Plaquemines Parish at the time of his appraisal than in the areas where his comparable properties are located. He found that the PDC's remaining acreage was less valuable than the 118 acres of active mining cells because the other acreage was servicing or supporting the active mining operation. He stated that there was no levee servitude over the 118 acres of active mining cells.

Mr. Justice valued the remaining acreage surrounding active cells at $10,000,00 per acre. He concluded that the value he gave to the supporting acreage was conservative because that acreage has the potential to become active mining pits and would then have a higher value. With those figures, his opinion is that his land residual analysis established the value of PDC's total acreage immediately prior to the taking at $21 million, or $38,000 per acre.[5]

Mr. Justice's opinion is that after the taking, the highest and best use of the north pit remained as a borrow pit, but the highest and best use of the south pit was changed to recreational use. He based that opinion on access and drainage issues

---

[5] 118 acres of active mining cells at $140,000.00/acre = $16,520,000.00. The remaining 457 acres (575 minus 118) at $10,000.00 = 4,570,000.00. $16,520,000.00 + $4,570,000.00 = $21,090,000.00.

affecting future borrow pit operations in the south pit. He referred to information provided to him suggesting that the orphaned south pit area would "be akin to a bowl" after the new levee is completed. He stated that "if there is some level of damage to the levee…I don't know this for certain; I'm just speculating…they [PDC] may be on the hook potentially for costs associated with repairing the levee." He also stated, "if they have damage to the levee and the Corps…decides to shut down accessing the levee into the rear [south] orphaned area…they [PDC] may lose time for use for mining that pit area." He said it was "also not outside the realm of possibility that if enough damage is done to the levee that the Corps can come in and say, 'You know what? We're pulling the permit.'" Mr. Justice's opinion is that contractors would look at the PDC south pit as no longer realistically viable for continued use as a borrow pit operation.

Mr. Justice testified that there were 67.8059 acres of servitude taken in the appropriation. Subtracting the 6.37 acres that were previously encumbered by servitude, he calculated the net new servitude at 61.4359 acres of previously unencumbered land that was taken as the new levee servitude.[6] He valued that acreage at $36,100.00 per acre. At $36,100.00 per acre, his opinion is the total loss in value of acreage actually appropriated by the public authorities was $2,217,836.00.[7]

---

[6] As stated above, the parties later stipulated that the servitude taken on PDC's property for the new levee was 68.3502 acres.
[7] 61.4359 acres valued at $36,100.00 per acre = $2,217,835.99.

He also concluded that there was severance damage to the property on the south side that is now outside of the levee system. He concluded that there are 254.5 acres in this orphaned area, and he placed a market value on that area after the taking at $400 per acre.[8] He found no severance damage on the north side of the property. Mr. Justice concluded that the total just compensation owed to PDC is $11,785,000, but his testimony did not include an explanation of how he arrived at this total amount. He testified that the property was valued at $21,000,000.00 before the taking, but did not state his conclusion as to the value post-taking, which was presumably $9,215,000.00 (the difference between $21,000,000.00 and 11,785,000.00), as found by the trial court.

Following Mr. Justice's testimony, the parties stipulated that the amount of the servitude taken on PDC's property for the new levee was 68.3502 acres. PDC then rested its case.

The first witness called by PPG was Kevin Wagner, USACE's project manager for the New Orleans to Venice Hurricane Protection Project. He identified access roads on a map, which included two existing access roads and a new one built by USACE. Mr. Wagner described the ramps being installed by USACE for PDC's access over the new levee. He said the ramps have a much flatter slope than USACE normally constructs in order to provide easier access. He said he is unaware of any permit requirement for access to utilize the ramps for

---

[8] Mr. Cali, PDC's consulting engineer, calculated that the actual surveyed acreage unprotected by the new levee was 301.32 acres instead of 254.5 acres as assumed by Mr. Justice when he prepared his report. The trial court, in its findings of fact, stated that the acreage unprotected by the new levee was 300.1 acres.

the new levee after construction is completed.  When asked about complaints made regarding the levee project contractor interfering with PDC's operations, Mr. Wagner replied that alternative access routes were provided by the contractor while construction activity was underway.

On the subject of drainage, he said no drainage problems have been brought to his attention since construction began on the new levee.  He explained that the new drainage structure being built by USACE is designed to carry the same amount of flow as before the construction of the new levee.  He described the new drainage structure, which through opened sluice gates and concrete pipes and culverts will allow drainage from the south portion of the property to the north portion through the new levee alignment to the drainage canal.  He also stated that the existing drainage canal along the back levee was widened and deepened.

On cross-examination, Mr. Wagner confirmed that after the levee construction project is finished, PPG will be responsible for operating the sluice gates and cleaning the trash screens.  He said the sluice gates will only be closed in the event of a potential incoming storm.

The next witness was David St. Marie, the President and Owner of Coastal Engineering Solutions.  He is a licensed professional engineer, and in his prior employment with a different company, he became involved with the federal levee project that is the subject of this litigation.  His former employer oversaw the design and construction reviews for the new levee system, including the revised drainage system.  On cross-examination, he acknowledged that he was not offering

opinions on PDC's ability to operate after the levee construction, the sufficiency of the drainage system or the adequacy of the access roads.

Scott Rousselle was the next witness. He is currently employed by PPG, and his current position is Assistant Director for Coastal Restoration and Flood Protection. He testified that when the levee project is completed, PPG will operate and maintain the new structures being built by USACE, including the sluice gate drainage structure. He said PPG will close the sluice gates when a storm approaches, but the gates will otherwise remain open. He stated that the total budget for his department is $300,000.00.

Henry Tatje was accepted as an expert in real estate appraisals. The trial court limited his testimony to what was in his expert report. In 2019, he appraised PDC's property in connection with the taking that is the subject of this lawsuit. The engineering firm handling appraisals for the levee system instructed Mr. Tatje to follow the guidelines of The Uniform Appraisal Standards for Federal Land Acquisitions, commonly referred to as "the Yellow Book." He stated that these are the guidelines that USACE requires to be followed for any of its projects.

Mr. Tatje testified that he conducted a "before and after" analysis to determine an estimate of the value of the property before the acquisition by PPG and after the acquisition to estimate the compensation owed to the landowner. He said that in 2017, when the PDC property was appropriated, 239 acres of the property were wetlands. He stated that this fact was significant because he knew

USACE would not allow any excavated material from wetlands to be used in their levees.

Mr. Tatje stated that before the taking, the PDC property included 24.5214 acres of encumbered land and 551.4586 acres of unencumbered land, for a total land area of 575.98 acres. He testified that the property had reportedly been used as a borrow pit operation for many years and was otherwise vacant and undeveloped land used for recreational hunting and fishing.

He noted that the PDC property was acquired by the current owners in 2008 for $1,305,966.00, or $2,267.00 per acre. He considered the assessed value and annual tax load of the property for the year 2018 (his appraisal was completed in 2019). His highest and best use analysis considered market conditions, potential uses and physical attributes, and he stated he considered those factors in determining the most profitable use of the property. He testified that he could not find information to convince him that there is a private market for materials from the PDC property. After also considering comparable properties, Mr. Tatje's opinion was that the highest and best use of the PDC property was "farming, ranching, hunting….those types of rural uses."

Mr. Tatje toured the property before and after construction of new levee began. He drove over the new levee ramps. He saw trucks going back and forth over the levee ramps and did not see any ruts or experience any problems with traversing the ramps. He saw the new drainage structure. His opinion was that the

property, including access and drainage, was at least the same as it was before the taking other than the fact that it now includes the new levee.

Mr. Tatje found that before the taking, the value of the unencumbered portions of PDC's property was $2,900.00 per acre and the value of the encumbered portions was $580.00 per acre, for a total pre-taking value of $1,613,500.00. He further found that after the taking, the new levee does not prevent PDC from continuing to use the property for recreational use but it might cause some inconvenience due to the new levee cutting the property in half, whereas there was no impediment before the taking. For that reason, he devalued the north pit by 20% in his "after" analysis, or $2,320.00 per acre, but he did not devalue any part of the south pit. He also devalued the properties underneath the new servitudes by 90% because this portion of the land was previously unencumbered. His "after" analysis resulted in a value for all of PDC property types at $1,339,500.00, or $2,325.52 per acre. He subtracted the total "after" value of $1,339,500.00 from the total "before" value of $1,613,500.00, to arrive at the figure of $274,000.00 for his opinion of the amount of compensation owed to PDC by PPG.

On cross-examination, he acknowledged that none of the comparable properties he considered in his analysis were permitted for borrow pit use. He did not attempt to value the minerals on PDC's property. He stated that under the Yellow Book guidelines he used in his analysis, he needed to find a substantial volume of dollar amount sales to private entities in order to justify a conclusion

that a borrow pit operation was the highest and best use for the property. And he did not find evidence of that, so his opinion was that the highest and best use of the property was for recreational purposes.[9]

PPG rested its case, and PDC called John Helmers as its first rebuttal witness. Mr. Helmers is a former employee of PPG, and was the Director of Coastal Resources and Protection. He was responsible for overseeing levees and repairs. At the time he held that position, there were only two people in that department, Mr. Helmers and Mr. Scott Rousselle. His testimony differed from that of Mr. Rousselle on the issue of the department's budget. Mr. Rousselle said the budget was $300,000.00, but Mr. Helmers said the department had no budget. Mr. Helmers' testimony was that PDC's property would be a low priority for PPG for levee repair after a storm.

The other rebuttal witness was Gary Chauvin, one of the managing partners of PDC. He said he met with two appraisers in 2019, and denied saying that 90%

---

[9] In its appeal brief, PPG referred to appraisals of the PDC property by Mr. Tatje and Ms. Rebecca Rothschild in its determination that $274,000.00 was the amount of just compensation owed to PDC. PPG states that Mr. Tatje's opinion as to the amount of just compensation owed to PDC was higher than that calculated by Ms. Rothschild so PPG tendered to PDC the amount calculated by Mr. Tatje. During PDC's case-in-chief, excerpts of Ms. Rothschild's deposition and several exhibits were introduced at trial in lieu of her testimony by agreement of the parties. She testified that she received instructions from USACE as to the methodology to be used in her appraisal, and the instructions referenced guidelines contained in the Yellow Book referred to in Mr. Tatje's testimony. Ms. Rothschild did not consider the PDC borrow pit operation in her determination of the highest and best use of the property because she found that the vast majority of demand for PDC's materials was from governmental entities, and the guidelines she was instructed to follow only allowed consideration of a use for which there was a competitive demand in the private market. Similar to Mr. Tatje's conclusion, Ms. Rothschild concluded that the highest and best use of the PDC property was for agriculture, recreation and speculative uses. The excerpts of her testimony and attached exhibits do not include the amount she concluded to be owed to PDC for just compensation for the taking.

of PDC's sales were for federal levees. He also said that percentage is not accurate.

PPG then proffered additional testimony from Henry Tatje.

Following trial, the trial court rendered judgment in favor of PDC and against PPG in the total amount of $14,958,600.00. The trial court issued written reasons for judgment and 55 findings of fact. PPG now appeals, alleging ten assignments of error.

**DISCUSSION**

"Appropriation, as opposed to expropriation, is carried out by a resolution of the appropriating authority, without the need for a judicial proceeding.... Furthermore, appropriation involves the taking of a servitude, whereas expropriation may involve the taking of ownership." *Bd. of Sup'rs of Louisiana State Univ. & Agric. & Mech. Coll. v. Mid City Holdings, L.L.C.*, 14-0506, p. 13 (La. App. 4 Cir. 10/15/14), 151 So.3d 908, 915 (citing *W. Jefferson Levee Dist. v. Coast Quality Constr. Corp.*, 93-1718, pp. 6-7 (La. 5/23/94); 640 So.2d 1258, 1302). La. R.S. 38:301(C)(1)(a) states: "All lands, exclusive of batture, and improvements hereafter actually taken, used, damaged, or destroyed for levee or levee drainage purposes shall be paid for at fair market value to the full extent of the loss." For land taken by way of a permanent levee servitude, compensation is fair market value of the property taken or destroyed before the proposed use. *S.*

*Lafourche Levee Dist. v. Jarreau*, 16-0788, 16-0904, p. 12 (La. 3/31/17), 217

So.3d 298, 307, (citing La. R.S. 38:301(C)(1)(h)).[10]

"The fair market value of property taken for public purposes is the price a

buyer is willing to pay after he has considered all of the uses to which the property

may be put, where such uses are not speculative, remote, or contrary to law."

*Jarreau*, 16-0788, 16-0904, p. 20, 217 So.3d at 311 (citing *W. Jefferson Levee*

*Dist. v. Coast Quality Constr. Corp.*, 93-1718, p.17, 640 So.2d at 1273). "The

current use of the property is presumed to be the highest and best use." *Id.* (citing

*W. Jefferson Levee Dist.*, p. 20, 640 So.2d at 1275).

"The trial court's factual determinations as to value of property and

severance damages, and his evaluation of and weight given to testimony of expert

witnesses, will not be disturbed on review in the absence of manifest error." *State*

*Dep't of Transp. & Dev. v. Stumpf*, 519 So. 2d 279, 282 (La. App. 5 Cir. 1988)

(citing *State, Dep't. of Transp. v. Van Willett*, 386 So.2d 1023 (La. App. 3

Cir.1980); *State, etc. v. Estate of Aertker*, 404 So.2d 316 (La. App. 3 Cir.1981)).

"Severance damages must be shown to a reasonable certainty and must not be too

remote or speculative, for the mere possibility of severance damages is an

insufficient basis for an award." *W. Jefferson Levee Dist. v. Coast Quality Const.*

---

[10] La. R.S. 38:301(C)(1)(h) states:

> The measure of compensation for lands and improvements taken or destroyed for levee and levee drainage purposes by way of a permanent levee servitude shall be the fair market value of the property taken or destroyed before the proposed use of the property or construction of the levee facilities, without allowing any change in value caused by the construction of the levee facilities. The measure of damages, if any, to the remaining property of the owner by reason of the use or destruction of a portion of the property is determined on a basis of immediately before and immediately after the use or destruction of the property for levee drainage construction, taking into consideration the effects of the completion of the project in the manner proposed or planned.

*Corp.*, 640 So.2d 1258, 1297 (La. 1994) (citing *State, Through Dep't of Transp. and Dev. v. Townsend*, 473 So.2d 99, 102 (La. App. 3 Cir. 1985)).

In the first assignment of error, PPG argues the trial court erred in finding that PDC's access to its property would be impaired by the new levee. PPG points to the trial court's findings of fact wherein he found that PDC's only access to its property is over the new levee. The trial court also found that PDC will be subject to government permission to cross the levee and further found that the access ramps built by USACE for PDC's use were not designed for the type of truck traffic associated with borrow pit operations and will likely deteriorate rapidly.

PPG argues that in addition to the central and downriver access servitudes which require crossing the levee to access the PDC property, a third upriver servitude provides access to the PDC property and is unaffected by the levee project. This alleged third access road runs from Louisiana Highway 23 to the northwest corner of the PDC property. The access road is referenced on exhibits including a Map of Division from the 2006 survey of the PDC property by Hugh McCurdy and in a letter from Philip Ramon to USACE. PDC contends that the existence of this third access servitude was never raised in the court below, and therefore cannot be considered by this Court.

PDC is correct that no information about a third access road from Highway 23 to the PDC property was developed through trial testimony, including whether or not PDC ever used this road or even had the right to use this road. For that reason, we find no error in the trial court's finding that PDC's only access to its property is now over the new levee.

However, we find the record does not show that PDC proved that its access to its property is or will be impaired by the new levee. The two access roads at

27

issue were built by USACE specifically for use by PDC. The testimony of Michael Gaffney and Philip Ramon regarding the potential for USACE to deny permission to PDC to use the access ramps as well as the potential for the access ramps to quickly deteriorate based on the materials used to construct the ramps is purely speculative. Mr. Ramon cited a section of USACE's Levee Permit Policy, which states, in part: "Work on or near a hurricane risk reduction levee will be restricted during hurricane season and will be evaluated on a case-by-case basis for possible waiver."[11] We agree with PPG's argument that this statement in the policy does not address the issue of PDC's ability to cross the levee.

The Notice of Appropriation specifically reserved to the landowners "all such rights and privileges in the land as may be used without interfering with or abridging the rights and easement hereby acquired." Nothing in the Notice of Appropriation supports PDC's contention that PDC will not be allowed to use the access roads installed by USACE for PDC's use.[12]

The record shows that PDC has not been denied access to its property and trucks are using the ramps to cross the levee. We find merit in PPG's argument that PDC's claims regarding potential access problems are based on the hypothetical occurrence of future events. "[T]he mere possibility of severance damages is an insufficient basis for an award." *W. Jefferson Levee Dist. v. Coast Quality Const.*

---

[11] The USACE Levee Permit Policy about which Mr. Ramon testified was not introduced into evidence at trial.

[12] One of the trial court's findings of fact cites La. R.S. 38:213, which provides that no person shall ride, drive or haul upon public levees unless ample provision is made to guard against damage to the levees from wear, tear and abuse. Section A of that statute also provides, in part: "Each levee district shall publish guidance, erect signage, and require special permits as they deem appropriate to allow them to make provisions for limited riding, driving, or hauling." However, Section D of that statute provides, in part: "Nothing in this Section shall interfere with the crossing over any public levees, at ramps or inclines established under plans and specifications of the Department of Transportation and Development, or, for levees or integrated coastal protection projects in the coastal area as defined in R.S. 49:214.2, the Coastal Protection and Restoration Authority."

*Corp.*, 640 So.2d 1258, 1297 (La. 1994) (citing *State, Through Dep't of Transp. and Dev. v. Townsend*, 473 So.2d 99, 102 (La. App. 3 Cir. 1985)). Because PDC did not prove that its access to its property will be impaired by the new levee, we conclude that the trial court erred in so finding.

The second and third assignments of error relate to the trial court's finding that the new level alignment would deprive PDC of the ability to use the orphaned tract (the south pit) as a borrow pit. In these two assignments of error, PPG argues that the trial court erred in so finding and in accepting Mr. Justice's loss valuations for that portion of the PDC property.

PPG cites the trial court's finding that the alignment of the new levee through PDC's property deprives PDC of the only existing non-wetland working area to process extracted material. PPG argues that this finding was erroneous because it was based on testimony of PDC's witnesses that a special permit would be needed to cross the levee. We agree.

As PPG notes, Mr. Ramon testified that the south pit has some area to process material. His testimony regarding PDC's inability to access that additional non-wetland acreage was based on his belief that a permit would be needed for trucks over a certain weight to cross the levee. As stated above, PDC's evidence on the issue of the potential for USACE to require a permit to cross the levee was merely speculative. As will be more fully discussed in the eighth assignment of error regarding Mr. Justice's loss valuations, PDC's failed to prove its claim that access issues have affected its ability to use the south pit. Therefore, we find the trial court erred in finding that the placement of the new levee deprived PDC of access to the south pit, and in accepting Mr. Justice's diminished value of the south pit in his calculation of the compensation owed to PDC.

In the fourth assignment of error, PPG argues that the trial court erred in finding that PDC's north field will have increased drainage issues after the new levee is constructed. PPG cites the trial court's finding that the north field will likely have drainage issues because the existing drainage flow, toward the rear of the property, will have to be reversed to flow toward the new drainage canal on the northern boundary of PDC's property. Mr. Wagner testified regarding efforts being made by USACE to reverse the original drainage flow. PDC's evidence did not establish that drainage in the north field will be a greater problem after the levee is completed than it was before construction began. Mr. Wagner testified that no drainage problems have been brought to his attention since construction began on the new levee. PDC did not offer any evidence that increased drainage problems have actually occurred since construction of the new levee began.

Mr. Wagner also testified that the new drainage structure being built by USACE is designed to carry the same amount of flow as before the construction of the new levee. Testimony to the contrary by PDC witnesses regarding potential drainage issues resulting from the construction of the new levee was purely speculative and cannot be the basis for an award for damages.

In the fifth assignment of error, PPG argues that the trial court erred in finding that the potential for future flooding during storm surge events damaged the orphaned tract. PPG argues that this finding is clearly wrong because it is based entirely on speculation that the risk of flooding after the new levee is constructed will be greater than before. We agree. PPG correctly states that PDC offered no evidence to establish that drainage time will be longer after the new levee is constructed than it was for prior flooding events. Because the record includes only speculative evidence on the issue of the increased potential for future

30

flooding damaging the orphaned tract, we conclude that the trial court erred in so finding.

In the sixth assignment of error, PPG argues that the trial court abused its discretion in admitting certain evidence produced by PDC after the discovery deadline while excluding PPG's evidence produced after the discovery deadline. PPG's argues the trial court abused its discretion in denying PPG's request to introduce correspondence between USACE and PDC regarding regulatory activity related to PDC's borrow pit operations, yet allowed PDC to supplement its discovery responses with a Code of Evidence Article 1006 summary exhibit, which included source documents contained in the summary that were disclosed to PPG only a week before trial.[13]

PPG acknowledged that the correspondence it sought to introduce was produced after the discovery deadline, but alleged that this delay was solely due to USACE's failure to timely comply with PPG's timely request for those documents. PPG also argues that the trial court abused its discretion in not allowing Mr. Tatje to testify regarding his criticisms of the methodology employed by Mr. Justice.

PPG argues that while excluding its evidence produced after the discovery deadline, the trial court nonetheless allowed PDC to introduce a summary exhibit seven days before trial that included newly disclosed invoices that provided data supporting the summary exhibit. PPG argues that allowing this evidence that was produced by PDC just days before trial materially prejudiced PPG because Mr.

---

[13] La. C.E. art. 1006 states:

> The contents of otherwise admissible voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

Justice relied on this information to determine that the highest and best use of the PDC property was a borrow pit.

"The trial court is granted broad discretion in its evidentiary rulings, which are not to be disturbed on appeal absent a clear abuse of discretion." *Detillieu v. La. Med. Mut. Ins. Co.*, 23-226, p. 7 (La. App. 5 Cir. 7/9/24), 392 So.3d 918, 928 (quoting *Moonan v. La. Med. Mut. Ins. Co.*, 16-113, p. 7 (La. App. 5 Cir. 9/22/16), 202 So.3d 529, 534). "The proper inquiry for determining whether a party was prejudiced by a trial court's alleged erroneous ruling on the admission or exclusion of evidence is whether the alleged error, when compared to the entire record, had a substantial effect on the outcome of the case. If the effect on the outcome of the case is not substantial, reversal is not warranted." *Landry v. City of Mandeville*, 21-1362, p. 12 (La. App. 1 Cir. 4/27/22), 342 So.3d 337, 347; La. C.E. art. 103(A); (quoting *Chiasson v. La. Med. Mut. Ins. Co.*, 19-0617, 19-0618, p. 6 (La. App. 1 Cir. 6/18/20), 307 So.3d 204, 209.)

PPG filed a motion *in limine* to exclude PDC's summary exhibit on the grounds that the summary data in the exhibit is not an accurate representation of the documents PDC produced in discovery as its purported sales history. The motion was argued at the beginning of trial. Counsel for PPG stated that seven days before trial, PDC produced invoices that it claims as summary source material. Counsel for PDC argued that PPG had at least a week to review the additional backup documentation. PDC claimed it should be allowed to introduce a summary exhibit if authenticated by the witness who prepared it. The trial court denied PPG's motion *in limine*, and noted that PPG's objection was only to the summary exhibit and not to the underlying data.

While we find no abuse of discretion in the trial court's decisions to disallow the introduction of the evidence produced by PPG after the discovery deadline or in limiting the testimony of Mr. Tatje to the opinions contained in his written report, we do find an abuse of the trial court's discretion in allowing the summary exhibit that included the additional invoices. However, as discussed below, even without the invoices at issue, there was sufficient evidence in the record to support Mr. Justice's conclusion that the highest and best use of PDC's property was as a borrow pit operation. Therefore, we conclude that any error in admitting the summary exhibit that included the invoices at issue was harmless as that evidence did not have a substantial effect on the outcome of the case.

In the seventh assignment of error, PPG argues that the trial court erred in finding that PDC's property had a highest and best use as a borrow pit. PDC's expert real estate appraiser, Mr. Justice, concluded after considering comparable properties and other evidence that the highest and best use of PDC's property was as a borrow pit. PPG's expert real estate appraiser, Mr. Tatje, concluded that the highest and best use was as farming or ranching or recreational uses such as hunting. The trial court accepted the opinion of Mr. Justice over that of Mr. Tatje on the issue of the determination of highest and best use.

Mr. Justice and Mr. Tatje presented testimony on the different methods they used to arrive at their determinations of highest and best use. PPG argues that Mr. Justice's opinion regarding highest and best use should not have been accepted by the trial court because he did not follow the standards set forth in the Uniform Appraisal Standards for Federal Land Acquisitions, known as the Yellow Book. PDC argues that PPG does not cite any Louisiana authority requiring that these federal standards be applied when valuing property appropriated by a local

governing authority. We have found no Louisiana authority to support PPG's argument that Mr. Justice's opinions should not have been accepted because he did not follow the federal Yellow Book standards.

The trial court found that the highest and best use of the PDC property was as a borrow pit. While the parties presented conflicting evidence as to the demand for PDC's materials before and after the appropriation in 2017, the record is clear that PDC operated as a borrow pit before the appropriation. Mr. Justice performed a land residual analysis to determine highest and best use of PDC's property and concluded that was as a borrow pit. The record supports this determination, and we find no error in the trial court's finding that the highest and best use of PDC's property is as a borrow pit.

In the eighth assignment of error, PPG argues that the trial court erred in accepting Mr. Justice's property valuations. The trial court awarded $14,958,600.00 to PDC as the fair market value for its property appropriated for the levee project, and stated that this amount includes compensation for the diminished portion of the property. In its reasons for judgment, the trial court stated that "the expert testimony presented by plaintiff, in particular the testimony of its expert appraiser, Baldwin Justice, established the measure of compensation owed to plaintiff for its 'orphaned' property."

"The factfinder is not required to accept or reject the testimony of any particular witness, but may give whatever weight it considers appropriate to the testimony of any and all witnesses in making a factual determination of the value of the property taken." *City of Baton Rouge v. Mucciacciaro*, 21-0656, p. 5 (La. App. 1 Cir. 5/25/22), 342 So.3d 955, 963 (citing *Terrebonne Par. Consol. Gov't. v. Richard*, 15-0728, pp. 8-9 (La. App. 1 Cir. 6/2/16), 196 So.3d 684, 688, 690).

As stated above, PDC offered only speculative evidence on the issue of potential access and drainage issues negatively affecting PDC's ability to operate its borrow pit operation. PDC did not prove that the new levee servitude has prevented or will prevent it from accessing its property, and also did not prove that the new levee has caused or will cause increased drainage problems on the property. The record supports PPG's argument that PDC's evidence as to potential access and drainage problems caused by the new levee consisted only of mere speculation. Accordingly, to the extent that Mr. Justice's valuations were based on PDC's unproven claims regarding lack of access and increased drainage problems affecting the value of the property, we find the trial court erred in accepting Mr. Justice's total valuations.

However, we conclude there is sufficient support in the record for Mr. Justice's acreage values based on his search of comparable properties. Mr. Justice concluded that the 118 acres of acres of active mining cells that are not encumbered by the new levee servitude have a value of $140,000.00 per acre. The remaining 457 acres, which support the active mining operation, have a value of $10,000.00 per acre. Therefore, we conclude that a value of $10,000.00 per acre for the 68.3502 acres comprising the new levee servitude is supported by the record, for a total compensation award of $683,502.00. We will amend the trial court judgment accordingly.

In the ninth assignment of error, PPG argues that the trial court erred in excluding Mr. Tatje's appraisal report from evidence. PDC's attorney objected to the introduction of the report as inadmissible hearsay because the witness was in court to testify as to his report. The trial court sustained the objection.

PPG argues that Mr. Tatje's report was prepared before PDC filed this lawsuit, and was not prepared in connection with litigation under the provisions of La. C.C.P. art. 1425 by a "specially retained expert." PPG argues that the report was admissible under the public records exception to the hearsay rule. La. C.E. art. 803(8).

PDC correctly notes that PPG did not make a contemporaneous objection when the trial court sustained PDC's objection to the introduction of Mr. Tatje's report. "[W]hen a party fails to lodge a contemporaneous objection to an evidentiary ruling, the party waives the right to complain on appeal." *Roberts v. Boxer*, 19-1038, p. 4 (La. App. 4 Cir. 11/18/20), 311 So.3d 513, 517 (citing *Aisola v. Beacon Hosp. Mgmt., Inc.*, 13-1101, p. 10 (La. App. 4 Cir. 4/2/14), 140 So.3d 71, 78; *St. Martinville, L.L.C. v. La. Tax Comm'n*, 05-0457, p. 5 (La. App. 1 Cir. 6/10/05), 917 So.2d 38, 42). Furthermore, any error in excluding the report would be harmless as Mr. Tatje was questioned at trial about his report and opinions.

In the tenth and final assignment of error, PPG argues that the trial court erred in awarding PDC attorneys' fees in the amount of $2,500.000.00. La. R.S. 38:301(C)(2)(f), regarding the award of attorneys' fees for cases involving land taken for levee purposes, provides:

> Reasonable attorneys' fees may be awarded by the court if the amount of the compensation found to be due by the state, the levee board, or the federal government is less than the amount of compensation awarded in any judgment seeking additional compensation. The attorneys' fees shall not exceed twenty-five percent of the difference between the award and the amount found to be due by the state, the levee board, or the federal government.

Stephen Scandurro, an attorney for PDC, testified regarding the work performed by his law firm in this matter. As stated above, we are amending the

trial court's judgment to reduce the compensation award owed to PDC to $683,502.00.  The amount tendered by PPG prior to the filing of this lawsuit was $274,000.00.[14]  The difference between these two amounts is $409,502.00. 25% of $409,502.00 is $102,375.50.  We find the record supports an award of attorneys' fees in that amount.

**CONCLUSION**

Based on the foregoing, we conclude that PDC is only entitled to just compensation for the taking of the land comprising the new levee servitude, or 68.3502 acres.  We further conclude that the fair market value of that portion of the property is $10,000.00 per acre.  Accordingly, we hereby amend the trial court judgment to reduce the amount awarded in favor of PDC and against PPG for the fair market value of the PDC property appropriated for the levee project from $14,958,600.00 to $683,502.00.  The judgment is also amended to reduce the award of attorneys' fees from $2,500,000.00 to $102,375.50.  In all other respects, the trial court judgment is affirmed.

**AMENDED, AND AS AMENDED, AFFIRMED**

---

[14] PPG was acting on behalf of the West Bank Levee District in the levee project.